

**U.S. BANKRUPTCY COURT**

**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**TAWANA C. MARSHALL, CLERK**

**THE DATE OF ENTRY IS**

**ON THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 14, 2015**

_Honli DeWayne Hale_

**United States Bankruptcy Judge**

---

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| RICHARD W. HARDING AND | § | Case No. 14-30282-hdh7 |
| MARY RENEE HARDING, | § | |
| | § | |
| Debtors. | | |

---

| | | |
|---|---|---|
| WILLIAM T. NEARY, | § | |
| UNITED STATES TRUSTEE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 14-03078 |
| | § | |
| RICHARD W. HARDING AND | § | |
| MARY RENEE HARDING, | § | |
| | § | |
| Defendants. | § | |

### <u>MEMORANDUM DECISION DENYING OBJECTION TO DISCHARGE</u>

This case presents the issue of whether the debtors' inaccurate statements in their bankruptcy filings or their incomplete financial records require this Court to deny them a discharge. On November 17, 2014, the Court conducted trial on the *United States Trustee's*

*Complaint Objecting to Discharge* (the "Complaint"), which initiated this adversary proceeding against Defendants Richard W. Harding and Mary Renee Harding, the debtors in the above-captioned bankruptcy case (the "Debtors"). In the Complaint, William T. Neary, the United States Trustee for Region 6 (the "Trustee") seeks a global denial of the Debtors' discharge pursuant to 11 U.S.C. §§ 727(a)(3) and (4)(A). The Trustee alleges that the Debtors knowingly and fraudulently made false oaths or statements and failed to keep or preserve adequate financial records necessary to ascertain the Debtors' financial condition. For the reasons set forth in greater detail below, the Court finds and concludes that, in this case, sufficient evidence has not been presented to support denial of the Debtors' discharge under 11 U.S.C. §§ 727(a)(3) or (4)(A).[1]

## JURISDICTION

This Court has jurisdiction over the parties and the claims asserted in this proceeding under 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(J). Venue is proper in this District under 28 U.S.C. § 1409(a).

## BACKGROUND

The Debtors filed a voluntary Chapter 7 petition on January 13, 2014 (the "Petition Date"). On January 22, 2014, the Debtors filed schedules disclosing their prepetition assets and liabilities [Case No. 14-30282, Docket Nos. 26, 27, and 31] (the "Original Schedules") and a statement of financial affairs [Case No. 14-30282, Docket No. 28] (the "Original SOFA").

Following the Debtors' 341 meeting and an examination conducted on February 13, 2014 pursuant to Federal Rule of Bankruptcy Procedure 2004 (the "Rule 2004 Examination"), the Debtors filed an amended version of their statement of financial affairs on February 25, 2014 [Case

---

[1] This memorandum opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. Where appropriate, a finding of fact should be construed as a conclusion of law, and *vice versa*.

No. 14-30282, Docket No. 51] (the "Amended SOFA").  The Debtors also filed amended versions of Schedule F on February 26, 2014 [Case No. 14-30282, Docket No. 52] and Schedule C on March 11, 2014 [Case No. 14-30282, Docket No. 82] (the "Amended Schedules").

While there was no one inciting incident for the Trustee's Complaint, the facts supporting the Complaint either relate to errors and omissions in the Original Schedules, the Amended Schedules, the Original SOFA, and the Amended SOFA or the Debtors' general lack of financial records.

## A.  Errors and Omissions in the Original Schedules, the Amended Schedules, the Original SOFA, and the Amended SOFA

In the Complaint, the Trustee alleges that the Debtors failed to disclose a number of prepetition transactions and improperly reported the value of certain of their assets.  While the facts are largely undisputed, the Trustee and the Debtors disagree over whether the Debtors were required to disclose certain transactions and the legal consequences of disclosures that were not made in the Original Schedules and the Original SOFA but were included in the Amended Schedules and the Amended SOFA.

### 1.  Checks Written to Carter-Harding Enterprises, LLC

Debtor Richard Harding used to be the 50% owner of Carter-Harding Enterprises, LLC ("Carter-Harding"),[2] but Carter-Harding filed a voluntary Chapter 7 petition on May 16, 2013.[3] The Trustee complains that the Debtors wrote three checks to Carter-Harding (the "Carter-Harding Checks") in the two years before filing their personal bankruptcy but did not disclose these on their Original SOFA or their Amended SOFA.  Specifically:

- On or about October 18, 2012, the Debtors wrote check no. 1320 for $7,100 to "Carter-

---

[2] The other owner of Carter-Harding was Steven Carter, who is not a debtor in this case.

[3] Case No. 13-32565 filed in the Bankruptcy Court for the Northern District of Texas.

Harding" from their personal Bank of Texas account ending in 6523.

- On or about April 17, 2012, the Debtors wrote check no. 5281 for $30,000 to "Carter-Harding Enterprises" from their personal Chase account ending in 1019.

- On or about April 24, 2012, the Debtors wrote check no. 5286 for $190,000 to "Carter-Harding Enterprises" from their personal Chase account ending in 1019.

The Debtors admit that Mr. Harding wrote the Carter-Harding Checks and further admit that the Carter-Harding Checks were not disclosed on the Original SOFA or the Amended SOFA.

The Debtors state that the reason for not disclosing the Carter-Harding Checks was because they were merely a pass-through to pay Mr. Harding's personal tax obligations. The tax obligations were owed by both Mr. Harding and Carter-Harding, but Carter-Harding did not have enough cash in its account to pay that debt. As a result, the Debtors did not consider the Carter-Harding Checks to represent actual transfers to Carter-Harding.

### 2. Check Written to Breitling Royalties Corporation

In response to question 10 of the Amended SOFA, the Debtors disclose the sale of "natural gas production of ORRI" to Breitling Royalties Corp. ("Breitling") on January 1, 2012. The Trustee complains that the Debtors also wrote check number 1349 for $15,231.94 to Breitling on or about January 3, 2013 from one of the Debtors' personal bank accounts (the "Breitling Check") but did not disclose the Breitling Check on their Amended SOFA.

The Debtors admit that they wrote the Breitling Check. The Debtors explain that they did not disclose the Breitling Check on the Amended SOFA because the funds being transferred pursuant to the Breitling Check were related to the ORRI that the Debtors previously sold to Breitling. As a result, despite the fact that the funds were originally sent to the Debtors, those funds did not actually belong to the Debtors and therefore did not represent a transfer of the Debtors' property when they were forwarded on to Breitling via the Breitling Check.

### 3.   Other Prepetition Transactions

The Trustee also complains that the Debtors did not disclose a number of prepetition transactions in their Original SOFA (the "Personal Property Transfers").  Specifically:

- On January 1, 2012, the Debtors sold their 2009 Mercedes SL 550 to Park Place Motorcars for $70,000.

- On February 1, 2012, the Debtors sold a 2009 Forest River Sierra Fifth Wheel Trailer to United RV Center for $24,500.

- During March 2013, the Debtors sold a Massey Ferguson 220-4/4x4 tractor to Buck Buchanan for $3,500.

None of these transactions were disclosed on the Debtors' Original SOFA.  The Chapter 7 Trustee and creditors learned of these transactions at the Debtors' Rule 2004 Examination, and the Debtors filed their Amended SOFA to disclose these transactions soon after, but only after, the Rule 2004 Examination.

While the Debtors admit that the transactions occurred and the two most recent transactions should have been disclosed on the Original SOFA, they note that the earliest two of the transactions occurred very close the cutoff for disclosure of two years before the Petition Date, and the sale of the trailer was not included in the Original SOFA simply because the Debtors did not realize it had occurred within two years of the Petition Date.  With respect to the sale of the tractor in March 2013, the Debtors note that this sale of personal property was related to a larger sale of real estate that the Debtors did disclose in the Original SOFA, but the Debtors did not remember the sale of the tractor until they retrieved additional records regarding the real property sale from the title company at the request of the Chapter 7 Trustee.

In any event, the Debtors acknowledge that two of these transactions did occur within two years of the Petition Date and should have been disclosed in the Original SOFA, and the Debtors disclosed all three of these transactions in the Amended SOFA.

4.   **The Debtors' Rolex**

In the Original Schedules, the Debtors disclosed on Schedule B, line 7 that their "everyday watches, costume jewelry, bracelets, cufflinks, necklaces, one dress watch" were worth $18,000. The Debtors claimed a $15,000 exemption against the total value of the jewelry under Texas Property Code §§ 42.001(a) and 42.002(a)(6).

The Chapter 7 Trustee asked to examine the Debtors' jewelry, and the Debtors complied with that request.  Upon examination, the Chapter 7 Trustee determined that the "one dress watch" was an authentic Rolex watch (the "Rolex Watch") with an original retail value of approximately $70,000.

Mr. Harding purchased the Rolex Watch for Mrs. Harding in August 2008 as an anniversary gift to replace a lost engagement ring.  Mr. Harding testified that the Rolex Watch has sentimental value for his wife, and early in the case, he indicated that he would be interested in attempting to purchase the watch back from the Chapter 7 Trustee in the event that the Rolex Watch was sold.

On June 16, 2014, the Chapter 7 Trustee sought permission to sell the Rolex Watch through an auction process [Case No. 14-30282, Docket No. 102].  After receiving approval, the Chapter 7 Trustee conducted an auction for the Rolex Watch, and the highest bidder was deBoulle Jewelry, which offered $31,500.  The next highest bidder for the watch was Eiseman Jewels, which offered $30,500.  On July 18, 2014, this Court entered an order approving the sale of the Rolex Watch to deBoulle Jewelry.

The Trustee alleges that the watch was intentionally undervalued to be within a few thousand dollars of the exemption limits.  In response, the Debtors noted that in a financial statement provided to a creditor in 2012, the Debtors estimated the value of all of their jewelry to be $15,000.  Mr. Harding further testified that prior to filing for bankruptcy, he looked for similar

6

watches online to determine the appropriate value of the Rolex Watch and used that research as guidance for the value of the Rolex Watch that was disclosed in the Original Schedules. The Debtors also presented evidence that when the Rolex Watch was appraised by a jeweler that the Chapter 7 Trustee asked the Debtors to take the watch to, the jeweler estimated the value of the Rolex Watch to be $20,000.

### 5. Transfers to Ricky Harding, Jr.

On the Amended SOFA, the Debtors disclosed transferring an estimated $5,000 per year to their son, Ricky Harding, Jr. for "[v]arious gifts of cash and payment for Blue Cross Blue Shield insurance." The testimony at trial showed that the Ricky Harding, Jr. is dependent on the Debtors for financial support.

The Trustee complains that this disclosure was not made in the Original SOFA. The Debtors note that they considered the gifts to their son to be family expenses rather than transfers.

### B. The Debtors' Financial Records

In the two years before the filing of the bankruptcy, from the period January 13, 2012 through January 13, 2014, the Debtors wrote over $200,000 in checks to themselves. The Trustee acknowledges that Mr. Harding has been able to account for approximately $77,680, which represents checks he wrote from one personal account and deposited into another. The remaining checks in the approximate amount of $125,000 appear to have been used for cash expenditures for which contemporaneous ledgers were not maintained.

At the Rule 2004 Examination, Mrs. Harding testified that she historically wrote checks to herself to cover various living expenses. Specifically, Mrs. Harding testified to spending money on restaurants, make-up, periodicals, her children, and her grandchildren. At the Rule 2004 Examination, Mr. Harding similarly testified that he and his wife regularly used cash "to pay living expenses or automobiles or . . . going out to eat, lunches, entertainment, things like that." At trial,

Mr. Harding also testified that they made considerable cash expenditures for several houses that they owned.  At one point, the Debtors owned three residences, which were all close to 100 years old and thus required a substantial amount of maintenance.  Mr. Harding testified that the Debtors did not maintain receipts for their cash expenditures.

Despite the lack of receipts or records for their cash transactions, the Debtors did provide a good deal of financial records to the Trustee.  Specifically, the Debtors provided the Trustee and/or the Chapter 7 Trustee (i) copies of their bank statements and checks for all of their personal bank accounts, (ii) business records of the Harding Company, (iii) the 2012 tax returns for R&S Partners, Carter Harding Enterprises, LLC, and CHG Energy, (iv) the HUD statements for all real estate sold by the Debtors from January 2012 through February 2014, (v) the 2011 and 2012 joint personal tax returns of the Debtors, (vi) a financial statement prepared by Mr. Harding in the fall of 2012, and (vii) original documentation of all of the real property interests of the Debtors reflected on Schedule A as well as the two original promissory notes reflected on Schedule B as well as a spreadsheet of the income from each of those assets.  In response to additional requests from the Trustee, the Debtors also went back to doctors and stores such as CVS Pharmacy, Tom Thumb, and Kroger for past records of cash expenditures and provided the Trustee with the additional records that they were able to obtain.

From the testimony, it is clear that it had been both of the Debtors' practice for a number of years to carry a good deal of cash and to pay for living expenses by cash.  The checking records of the Debtors during the year before the bankruptcy filing are consistent with their practices two years before the filing.  The Debtors would often write checks for cash to themselves, which they credibly testified were used for lunches and dinners at restaurants, both by themselves and with their children and grandchildren, gasoline, groceries, entertainment and pharmaceutical products as well as doctor's visits.  The majority of the expenditures for cash were made by Mrs. Harding

as she was not working or generating any income.

The Debtors maintained adequate books and records as to all of their real estate transactions and their loan transactions, filed annual joint tax returns, and maintained all bank statements and checking records for at least two years prior to the bankruptcy filing.

## LAW AND ANALYSIS

Under 11 U.S.C. § 727(a), a bankruptcy court will grant a debtor's discharge unless it is shown that such debtor falls within one of the exceptions enumerated in that section. This Court has previously stated that it does not entertain requests for denial of discharge lightly given the severity of the consequences. The Trustee asserts that the Debtors fall under at least one of the exceptions to discharge. Under subsections (3) and (4)(A) of section 727(a), the Court will deny the Debtors' discharge if it is shown that (1) the Debtors unjustifiably concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information from which their financial condition or business transactions might be ascertained[4] or (2) the Debtors knowingly and fraudulently made a false oath or account in or in connection with the bankruptcy case.[5]

### *False Oath*

Turning first to subsection (a)(4)(A), a showing of a "false oath" requires the Trustee prove "(1) [the Debtors] made a statement under oath; (2) the statement was false; (3) [the Debtors] knew the statement was false; (4) [the Debtors] made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." *See Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 566 (5th Cir. 2005). The Trustee asserts that the Debtors' lack of disclosure regarding the transfers effected by the Carter-Harding Checks, the transfer effected by the Breitling Check, the

---

[4] Section 727(a)(3).

[5] Section 727(a)(4)(A).

Personal Property Transfers, the transfers to Ricky Harding, Jr., and the value of the Rolex Watch constitute false oaths warranting denial of the Debtors' discharge.

As an initial matter, while the Trustee has successfully identified some inaccurate statements made under oath, the Trustee has not shown that the Debtors made any of these statements with fraudulent intent. The Trustee correctly points out that "[c]ircumstantial evidence may be used to prove fraudulent intent, and the cumulative effect of false statements may, when taken together, evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent,"[6] but bankruptcy courts in this district have also stated on numerous occasions that they will not bar a discharge by just counting mistakes and deriving fraudulent intent. *See, e.g.*, *Benchmark Bank v. Crumley (In re Crumley)*, 428 B.R. 349, 367 (Bankr. N.D. Tex. 2010); *Neary v. Jordan (In re Jordan)*, 364 B.R. 634, 638-39 (Bankr. N.D. Tex. 2007); *Cadle Co. v. Preston-Guenther (In re Guenther)*, 333 B.R. 759, 767-68 (Bankr. N.D. Tex. 2005) (stating that it "may be close to impossible to produce Schedules and SOFAs that contain no mistaken information, and bankruptcy papers with mistakes are not, alone, enough to bar a debtor's discharge"). Individual bankruptcy cases often involve people who are under stress and without all their records, and thus who make mistakes in their forms. However, mistakes by themselves do not equal fraudulent intent meriting denial of discharge. *In re Jordan*, 364 B.R. at 639.

At trial, the Debtors provided credible explanations for the lack of disclosure regarding the Carter-Harding Checks, the Breitling Checks, the Personal Property Transfers, and the transfers to their son. The issues surrounding the Rolex Watch have required a great deal of consideration from this Court. While the Court was initially concerned with the value of the Rolex Watch disclosed in the Original Schedules, the Court ultimately concluded that the Debtors have provided

---

[6] *Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 695 (5th Cir. 2009).

a reasonable explanation for that as well. The Debtors' estimated value of the Rolex Watch of $16,000 differed significantly from the $31,500 that the Chapter 7 Trustee was ultimately able to sell it for, and it is clear that the Debtors had a sentimental attachment to the Rolex Watch. Mr. Harding, however, testified credibly that he made a reasonable effort to determine the value of the Rolex Watch prior to filing the Original Schedules, and he was fully cooperative when the Chapter 7 Trustee wanted to investigate the value of the Rolex Watch further.

The Debtors provided a great deal of disclosure through their Original Schedules and Original SOFA, their testimony at the 341 meeting, their testimony at the Rule 2004 Examination, and their responses to informal requests for information from the Trustee. Furthermore, once it became apparent that it was necessary to do so, the Debtors filed their Amended Schedules and Amended SOFA promptly to clarify and supplement previous disclosures. Given the totality of the circumstances, including the nature of the information that the Debtors failed to disclose and the manner in which the information was discovered and ultimately disclosed, this Court does not find that the Debtors made statements with fraudulent intent. As a result, the Debtors' discharge will not be denied pursuant to section 727(a)(4)(A).

### *Failure to Maintain Books and Records*

Section 727(a)(3) provides that the Court will deny the Debtors' discharge if it is shown that the Debtors concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information from which their financial condition or business transactions might be ascertained unless such failure to act was justified under all of the circumstances of the case.

The Trustee bears the initial burden to show that the Debtors failed to keep and preserve financial records that prevented interested parties from ascertaining their financial condition. *Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 703 (5th Cir. 2003). A debtor's financial records need not contain full detail, but there should be written evidence of the debtor's financial condition.

*Id.* The purpose of section 727(a)(3) is "to allow creditors and/or the trustee to examine the debtor's financial condition and determine what has passed through a debtor's hands." *Pher Partners v. Womble (In re Womble)*, 289 B.R. 836, 856 (Bankr. N.D. Tex. 2003) (citing *WTHW Inv. Builders v. Dias (In re Dias)*, 95 B.R. 419, 422 (Bankr. N.D. Tex. 1988)). If the trustee's initial burden is satisfied, the burden shifts to the debtor to prove that the inadequacy is justified based on the totality of the circumstances, including what a reasonable person would do in similar circumstances. *See In re Dennis*, 330 F.3d at 703. The court has broad discretion in determining both the sufficiency of the records provided and, if those records were insufficient, whether the inadequacy is justified. *Id.*

The Trustee complains that in the two years prior to the Petition Date, the Debtors wrote checks to themselves in the approximate cumulative amount of $125,000 but did not maintain contemporaneous ledgers to account for the use of this money. The Debtors acknowledge that these funds were used for cash expenditures for which they did not maintain receipts, but they maintain that these expenses were personal living expenses such as eating out at restaurants, purchasing groceries, paying doctors, traveling to see their grandchildren, and maintaining their three residences. The Debtors were unable to provide contemporaneous records for these alleged cash expenditures, but they did provide testimony and other evidence to describe how these funds were spent.

At trial, counsel for the Trustee relied on the case of *Neary v. Hughes (In re Hughes)*, 353 B.R. 486 (Bankr. N.D. Tex. 2006), but there are significant differences between *Hughes* and this case. The debtor in *Hughes* had no bank accounts, used cash extensively, and kept no records of his cash expenditures. *Id.* at 493-94. In *Hughes*, however, the debtor's stated purpose for handling money in this way was to avoid garnishments, and his testimony regarding how he spent money was not consistent. *Id.* In addition, the evidence and documentation that the debtor provided

regarding how much income he received and where that income came from was wildly inconsistent. *Id.* at 494-96. These facts, coupled with the several business entities involved and the partition agreement with his non-debtor spouse, left creditors without sufficient information to determine the debtor's financial condition. In the case presently before this Court, however, the Debtors provided accurate and detailed information regarding their business transactions and a good deal of their personal transactions. Their income was clear, but because of their pervasive use of cash for personal expenses, they were not able to provide a full accounting of those funds.

Indeed, unlike many of the cases relied upon by the Trustee, these Debtors provided complete bank account records (both statements and copies of checks) for the entire two years preceding their bankruptcy filing, along with their joint tax returns. Furthermore, the expenditures that the Trustee complains of covered daily living expenses rather than the Debtors' business transactions, for which the Trustee was provided detailed records and documentation. In that respect, this case is similar to *Cadle Co. v. Preston-Guenther (In re Guenther)*, 333 B.R. 759 (Bankr. N.D. Tex. 2005). In *Guenther*, the debtors produced to their creditors "financial information including tax returns, general ledgers, bank statements, and checks and deposit slips . . . for their personal accounts and each of their business entities" in addition to personal credit card statements that were retained for business expenses. *Id.* at 765. However, the debtors in *Guenther* were not able to produce all of their personal credit card statements. *Id.* Nevertheless, the Court found that the "Debtors' deficiencies were minor, given the massive amount of information reviewed and provided to [the creditor]" and the "Debtors' records contain information that would reasonably be maintained with respect to their personal affairs . . . ." *Id.* at 766. As in *Guenther*, the Debtors have provided adequate records with respect to their business transactions, but have not maintained detailed records with respect to their personal expenses. In

both cases, the information provided still allowed creditors to ascertain the Debtors' financial condition.

Under the circumstances, the records and documentation provided by the Debtors allowed creditors to ascertain the Debtors' financial condition and business transactions. In addition, even if the records provided had been insufficient, it was reasonable for the Debtors—who traditionally dealt in cash rather than checks, debit cards, or credit cards for these types of expenditures—not to retain receipts for their groceries, restaurant bills, pharmacy bills, and expenditures made in connection with visiting with their children and grandchildren as none of those expenditures related to any business, nor did they concern any deductible items in connection with the Debtors' personal taxes. Accordingly, the Debtors' decision not to maintain contemporaneous records for these cash transactions was justified under all of the circumstances of this case. As a result, the Debtors' discharge will not be denied pursuant to section 727(a)(3).

## CONCLUSION

The bankruptcy process requires honesty and full disclosure of information. However, innocent mistakes by a debtor are not enough to merit a global denial of discharge. The facts surrounding the Rolex Watch caused this Court to hold this matter longer than usual; however, while the information provided by the Debtors was not perfect, the Debtors appear to have tried in good faith to provide as much information as possible, and the Trustee has not shown that the Debtors made any statements with fraudulent intent. The Debtors provided a good deal of information regarding their business dealings and their more significant personal transactions, but their pervasive use of cash for day to day expenditures and their relatively lavish lifestyle made a full accounting of their personal expenditures impractical. Under the circumstances, the Court does not believe that this warrants denial of the Debtors' discharge. The Debtors' lack of records did not ultimately prevent parties in this case from ascertaining the financial condition of the

Debtors, and the Court believes that the lack of records was justified under the circumstances.

**IT IS THEREFORE ORDERED** that counsel for the Debtors shall submit a form of judgment providing that the Debtors' discharge is not denied.

###END OF ORDER###